**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **TAMARA M. LESLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:12-CV-149** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Tamara Lesley appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[2] (*See* Docket # 1.) For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Lesley applied for SSI and DIB in March 2009, alleging that she became disabled as of

January 1, 2008. (Tr. 137-38, 144-46.) The Commissioner denied Lesley's application initially

and upon reconsideration, and Lesley requested an administrative hearing. (Tr. 76-92, 101-18.)

On September 7, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") John

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013. (Docket # 24 at 1 n.1.) As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

Pope, at which Lesley, who was represented by counsel; her sister; and a vocational expert testified. (Tr. 39-71.) On October 19, 2010, the ALJ rendered an unfavorable decision to Lesley, concluding that she was not disabled because she could perform a significant number of unskilled, sedentary jobs in the economy. (Tr. 16-32.) The Appeals Council denied Lesley's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-12, 289-92); 20 C.F.R. §§ 404.981, 416.1481.

Lesley filed a complaint with this Court on May 11, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Lesley contends that the ALJ improperly discounted the credibility of her symptom testimony and improperly considered the opinion of her treating family practitioner, Dr. Bryan. (Docket # 18.)

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Lesley was thirty-nine years old; had a high school education; and possessed work experience as an associate manager, cashier, and in data conversion. (Tr. 44, 137, 288.) She alleges that she is disabled due to lumbar disk herniation, severe right lumbar radiculitis, spinal stenosis, status post interbody fusion at L5-S1, Type 2 diabetes, and hypertension. (Opening Br. 2.)

At the hearing, Lesley, who was five feet four inches tall and weighed 255 pounds, testified that she lives alone in a one-story home. (Tr. 43-44.) She stated that her back pain and tingling in her hands and feet prevent her from working. (Tr. 47.) She performs most of her self

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 732-page administrative record necessary to the decision.

care independently, but requires assistance with washing her hair and shaving her legs. (Tr. 52.) She typically grocery shops on her own, but goes with her sister when heavy lifting is required. (Tr. 52-53.) She drives a car on a "good day," using her left foot to operate the gas pedal. (Tr. 58.) Lesley sees her boyfriend every day, her sister twice a week, and her parents once a week; she states that she has no difficulty getting along with people. (Tr. 54.)

When asked to describe her typical day, Lesley stated that she prepares light meals and performs a few household chores, but otherwise reads magazines, watches television, and "pretty much sleep[s] all day." (Tr. 50-52.) Her pain is centered in her right hip and extends down her right leg into her toes and increases with activity; she also experiences tingling in her right leg and right thumb. (Tr. 55-56, 59-60.) She sometimes loses her grip on items. (Tr. 59-60.) Medications, ice, and reclining in bed with her feet propped up on pillows help reduce her pain, but the medications make her feel "groggy." (Tr. 50, 56.) She also complained of depression and anxiety, which cause her to become easily irritated and emotional, and that she has difficulty concentrating. (Tr. 53-55.)

Lesley estimated that she could sit for fifteen minutes before needing to "shift, move, [or] walk around." (Tr. 47.) In an eight-hour period, Lesley thought that she could walk ninety minutes, stand one hour, and sit for ninety minutes; she said that she could lift a gallon of milk.[4] (Tr. 56-58.)

### B. Summary of the Medical Evidence

In February 2008, Lesley went to the emergency room due to back and right leg pain, as

---

[4] Lesley's sister also testified at the hearing, essentially corroborating her testimony. (Tr. 63-66.)

well as numbness and tingling in her right leg. (Tr. 411-12.)  An MRI showed disk protrusion at L5-S1, mild disk desiccation, and mild facet arthritic changes. (Tr. 411.)  She was diagnosed with lumbar disk herniation with right-sided leg pain. (Tr. 412.)

On December 1, 2008, Lesley returned to the emergency room, complaining of a one-year history of low back pain; she had recently obtained insurance and was seeking a primary care provider. (Tr. 437-39.)  An MRI of the lumbar spine showed minimal central right paracentral disk bulge at L5-S1, mild disk desiccation, and mild to moderate facet degenerative changes. (Tr. 436.)

A few weeks later, Lesley saw Dr. Julie Bryan, a family practitioner, for an initial evaluation, complaining of pain in her back and right leg, hip, and groin area, which worsened with standing. (Tr. 451-53.)  She stated that she had reduced her work hours due to the pain, but had not yet tried medications to alleviate her symptoms. (Tr. 451.)  Dr. Bryan observed that Lesley was sitting in a chair leaning on her left buttock. (Tr. 452.)  Her strength was normal in all extremities, her gait was normal, and a straight leg raising test was negative bilaterally. (Tr. 452.)  Dr. Bryan diagnosed her with back pain, diabetes, hypertension, hypertrglyceridemia, and hirsutism. (Tr. 453.)

In January 2009, Lesley visited Dr. Roger Thomas at Orthopaedics Northeast for her low back pain. (Tr. 431-32.)  A straight leg raising test was mildly positive. (Tr. 431.)  After a physical evaluation, his impression was low back pain with lumbar radiculitis bilaterally. (Tr. 431.)  He referred her for a lumbar epidural steroid injection, which Dr. S. Kulkarni administered the following month. (Tr. 431, 465-66.)  She also was evaluated by a physical therapist. (Tr. 445.)  In April, Lesley told Dr. Thomas that she had been "doing well" with her back and leg

pain and had reduced her Vicodin, but that her discomfort had somewhat returned. (Tr. 463.) A straight leg raising test was positive on the right, but negative on the left. (Tr. 463.) Dr. Thomas continued Lesley's medications and ordered a second injection and more physical therapy. (Tr. 463.)

A week later, Lesley returned to the emergency room for low back and chest pain, reporting that her back pain was "usually well controlled" with Naprosyn and Vicodin but that it had increased in the last twenty-four hours. (Tr. 472-73.) She had no weakness in her leg, but reported that it did "buckle" on her a few times; her gait was normal. (Tr. 472-73.) On physical exam, she was extremely tender to the left of the lumbar spine with paraspinal musculature tenderness extending down to the left sacroiliac joint; there was also right paraspinal muscular tenderness. (Tr. 473.) She was diagnosed with lumbar back pain with radicular symptoms down the right lower extremity with a history of lumbar disk disease. (Tr. 473.)

In May 2009, Lesley underwent a psychological exam by Candace Martin, Psy.D. (Tr. 527-30.) On mental status exam, Lesley was nicely groomed, but walked with a slow gait using a cane; she displayed physical discomfort with sitting, rising, standing, and walking. (Tr. 528.) Her attention and concentration were adequate. (Tr. 528.) She acted in an appropriate manner, but her mood seemed reflective of discouragement. (Tr. 528.) She did not evidence signs of clinical depression; rather, Dr. Martin found that her depression was reportedly secondary to her physical complaints and a loss of physical ability to engage in enjoyable activities. (Tr. 529-30.) Her performance on the mental status exam was well within normal limits. (Tr. 529-30.) Dr. Martin concluded that Lesley's ability to engage in gainful employment related only to her physical problems; diagnosed her with an adjustment disorder with depressed mood; and

assigned a Global Assessment of Functioning ("GAF") score of 65.[5] (Tr. 529-30.)

In June 2009, Dr. H.M. Bacchus performed a physical examination at the request of Social Security. (Tr. 532-34.)  He noted tenderness to palpitation and a reduced range of motion in her right hip and lumbar spine. (Tr. 533.)  Her gait was slightly antalgic and stiff, and she favored her right leg; she was slow to rise. (Tr. 533.)  She used a cane and could barely tandem walk or walk on her heels or toes; she was unable to hop and could squat only a quarter of the way down. (Tr. 533.)  She had range of motion deficits in the neck, low back, right hip, and right leg, and a straight leg raising test was positive. (Tr. 533.)  Her gait sustainability was fair; without a cane, her gait was even slower and more antalgic. (Tr. 533.)  Her muscle strength and tone were normal, except for her right lower extremity, which was 4/5. (Tr. 533.)  Dr. Bacchus concluded that Lesley retained the functional capacity to perform light duties that allowed for frequent position changes. (Tr. 533.)

That same month, Dr. R. Fife, a state agency physician, reviewed Lesley's record and completed a physical functional capacity assessment. (Tr. 535-42.)  He concluded that she could lift ten pounds frequently and twenty pounds occasionally; stand or walk at least two hours in an eight-hour workday; sit for at least six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to wetness and hazards, including unprotected heights and uneven surfaces. (Tr. 539.)  Dr. Fife disagreed with Dr. Bacchus's finding that

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

Lesley needed to frequently change positions. (Tr. 541.) Dr. Fife's opinion was later affirmed by a second state agency physician. (Tr. 616.)

Lesley visited the emergency room again in June 2009 for her back pain. (Tr. 546-47.) She reported that although her last epidural injection did help somewhat, she still had pain in the posterior part of her leg. (Tr. 546.) She continued to take Oxycontin. (Tr. 546.) On physical exam, she had pain on flexion and some tenderness on extension, as well as pain with a straight leg raising test on the right. (Tr. 546.) She received another spinal injection. (Tr. 547.)

Also in June, J. Larson, Ph.D., a state agency psychologist, reviewed Lesley's record and concluded that her mental impairment was not severe. (Tr. 561-73.) A second state agency psychologist later affirmed Dr. Larson's opinion. (Tr. 615.)

That same month, Dr. Thomas noted that Lesley had a lot of discomfort in the right gluteal area. (Tr. 597.) He thought that the injection helped reduce the back pain, but was not as effective with her leg pain. (Tr. 597.) He observed that although Lesley was neurologically stable, her pain was intractable. (Tr. 597.) He prescribed a TENS unit and continued her Hydrocodone and home exercise program. (Tr. 597.)

In July, Dr. Thomas indicated that Lesley was still having discomfort across her back and down her leg. (Tr. 590-91.) She reported that the TENS unit was helping somewhat. (Tr. 590.) On physical exam, Lesley was tender in her right gluteal area; she had a positive straight leg raising test and mild dysesthesias in the lateral aspect of her left forefoot. (Tr. 590.)

In September 2009, Dr. Thomas reported that Lesley had received some relief from the two epidurals, but that the discomfort was returning. (Tr. 657.) On physical exam, she had a positive straight leg raising test on the right; a sensory motor examination showed positive

tenderness. (Tr. 657.) She received another injection, but this time it did not decrease her pain. (Tr. 654.) In October, Lesley again had a positive straight leg raising test and tenderness. (Tr. 654.) She also had difficulty transferring, and she walked with essentially decreased weightbearing and an antalgic right-leg gait. (Tr. 654.) An EMG, however, was normal. (Tr. 650.) Later that month, Dr. Thomas summarized that although Lesley had received physical therapy and three epidural injections, her symptoms had not really changed; her medications, however, did help somewhat. (Tr. 648.) An MRI showed stable degenerative changes at L4-5 and L5-S1. (Tr. 648.) He diagnosed her with right lumbar radiculitis, severe in nature. (Tr. 648.)

In December 2009, a lumbar discogram showed concordant discogenic back pain at L5-S1 and a normal controlled disk at L3-4 and L4-5. (Tr. 639-40.) Also that month, Lesley was evaluated by Dr. Alan McGee, an orthopaedic surgeon. (Tr. 632.) She demonstrated very limited range of motion of her lumbar spine and weakness of her right "EHL," ankle dorsiflexion. (Tr. 632.) A straight leg raising test was positive on the right, but negative on the left, and Dr. McGee diagnosed her with L5-S1 discogenic pain. (Tr. 632.) He recommended that she undergo a fusion and decompression surgery since conservative treatment measures had not relieved her symptoms. (Tr. 632.)

On December 22, 2009, Dr. Bryan saw Lesley for a preoperative consult. (Tr. 666-60.) Lesley denied pain or stiffness in her joints with the exception of her right hip. (Tr. 668.) She reported right lower extremity weakness due to radiculopathy and some numbness and tingling in her toes. (Tr. 668.) She ambulated with the help of a cane, standing only for brief periods due to pain and weakness in her right leg. (Tr. 659.) She also had some problems with depression and anxiety. (Tr. 668.) Dr. Bryan cleared Lesley for surgery. (Tr. 669.)

In February 2010, Lesley complained to Dr. McGee of uncontrolled, throbbing pain, which she rated as a "nine" on a ten-point scale. (Tr. 690.) Her pain had significantly worsened. (Tr. 690.) In April, Dr. McGee performed a surgical procedure at L5-S1, which included a fusion, decompressive laminotomies and foraminotomies, and a diskectomy. (Tr. 698.) At a post-operative visit in May, Lesley was doing well, rating her pain as a "three" and stating that she was "significantly improved." (Tr. 729.) She was instructed to wear a back brace, to ambulate with a walker or cane, not to drive until she was comfortable with twisting and bending, and to refrain from lifting more than ten pounds. (Tr. 729.) In June, Lesley stated that her condition had "slightly improved" and that her pain, which she rated as a "six," was "under control." (Tr. 724.) X-rays showed that the hardware was in good position and that she was healing. (Tr. 724.) She reported that sitting increased her pain, but that resting helped alleviate it. (Tr. 725.) She returned to physical therapy for several months. (Tr. 718-19.)

Dr. Bryan, Lesley's family practitioner, saw Lesley approximately eleven times between December 2008 and August 2010 for a review of systems and physical examination. (Tr. 450, 451-53, 576-77, 662, 665-69, 670, 674, 732.) More extensive evaluations were completed at her first visit on December 18, 2008, and at a preoperative consult on December 22, 2009. (Tr. 451-53, 666-69.) On June 25, 2010, Dr. Bryan completed a medical source statement on Lesley's behalf, indicating a diagnosis of spinal stenosis and status post interbody fusion at L5-S1. (Tr. 711-17.) She identified Lesley's symptoms as back pain at a level "eight" when sitting, standing, or walking, noting that she felt best when lying down with her feet elevated. (Tr. 711.) Her right lateral leg and foot were numb. (Tr. 711.) Dr. Bryan wrote that there was no improvement since surgery and that Dr. McGee did not expect improvement for at least a year.

(Tr. 711.)  She represented that Lesley was very limited by pain and that she was on restrictions due to her surgery. (Tr. 711.)  Dr. Bryan's clinical findings included very slow gait, heavy reliance on her cane, significant weakness in the right leg, inability to raise her right leg more than three inches when sitting, and inability to sense pinprick in her lateral leg. (Tr. 712.)  She also wrote that Lesley took significant sedating medication and was forgetful in that she could not read books due to her poor concentration and memory. (Tr. 712.)

Dr. Bryan estimated that Lesley could sit for fifteen minutes at a time; stand for fifteen minutes at a time; and work just five hours a week. (Tr. 712-13.)  She elaborated that Lesley would need to walk for fifteen minutes more than ten times during an eight-hour workday; shift positions at will; and take twenty-five minute breaks every hour because of pain, fatigue, and medication side effects. (Tr. 713-16.)  Dr. Bryan also indicated that Lesley needed to use a cane all the time due to her right leg weakness and poor balance; that she could lift no more than ten pounds; and that she would miss more than three days of work per month due to her medical condition. (Tr. 714, 716.)  Dr. Bryan opined that Lesley was quite depressed over her current impairments and that her medication side effects and diabetic neuropathy of her hands caused an additional impairment. (Tr. 717.)

In August 2010, Lesley returned to Dr. McGee, reporting a pain level of "seven" and that she had low back spasms. (Tr. 720.)  She denied any leg pain bilaterally and reiterated that her pain decreased with rest and increased with activity; he noted that her condition had not changed. (Tr. 720.)  A straight leg raising test was negative bilaterally. (Tr. 720.)  An x-ray showed that the hardware was in good position and that she was healing. (Tr. 720.)  He adjusted her medications and scheduled to see her back in three months. (Tr. 720.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On October 19, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 16-32.) She found at step one of the five-step analysis that although Lesley had worked part time after her alleged onset date, the work did not rise to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

level of substantial gainful activity. (Tr. 18.)  The ALJ concluded at step two that Lesley's

degenerative disk disease, diabetes, and obesity were severe impairments, but found at step three

that her impairment or combination of impairments were not severe enough to meet a listing. (Tr.

18-20.)

Before proceeding to step four, the ALJ determined that Lesley's symptom testimony

was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . .
> except the claimant must use a cane for ambulation.  The claimant requires the
> ability to sit/stand as needed to relieve pain.  The claimant can never climb
> ladders, ropes or scaffolds.  She can occasionally climb ramps, climb stairs,
> balance, stoop, kneel, crouch, and crawl.  The claimant should avoid concentrated
> exposure to hazards.  She cannot push or pull with the right lower extremity.

(Tr. 20.)  Based on this RFC and the VE's testimony, the ALJ concluded at step four that Lesley

was unable to perform any of her past relevant work. (Tr. 30.)  The ALJ then concluded at step

five that she could perform a significant number of unskilled, sedentary jobs within the

economy, including inspector, assembler, and bench packer. (Tr. 31.)  Accordingly, Lesley's

claims for DIB and SSI were denied. (Tr. 31.)

### C. *The ALJ's Credibility Determination Will Not Be Disturbed*

In one of her two challenges to the Commissioner's final decision, Lesley contends that

the ALJ improperly discounted the credibility of her symptom testimony.  The ALJ's credibility

assessment, however, is adequately supported.

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at

435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's

credibility determination because the ALJ's decision was based on "serious errors in reasoning

rather than merely the demeanor of the witness . . . .").

Here, Lesley testified that her back pain is disabling in that in an eight-hour workday she

could walk for just ninety minutes, sit for ninety minutes, and stand for sixty minutes (Tr. 56-

68), and her medications cause her to "pretty much sleep all day" (Tr. 50). The ALJ, however,

discredited the severity of Lesley's symptom testimony on several bases. The ALJ deduced that

although Lesley certainly had some limitations due to back pain, the medical records did not

reflect such severe limitations that would preclude all sedentary work. (Tr. 14.) To illustrate this

point, the ALJ first thoroughly catalogued the medical findings and the treatment that Lesley had

received. *See generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir.

2010) (explaining that "tidy packaging" is not required in an ALJ's decision, as the court reads it

"as a whole and with common sense").

The ALJ observed that although Lesley claimed an onset date of January 1, 2008 (Tr.

16), her physical examination findings in 2008 were rather mild and no limitations were assigned

(Tr. 22-23). He noted, for example, that an MRI of the lumbar spine in November 2008 was

unremarkable other than some disk protrusion toward the right, mild disk desiccation, and mild

facet degenerative changes; similarly, a physical examination at the emergency room in

December was normal except for some positive sacroiliac joint pain tenderness on the right. (Tr. 22-23.) In that same vein, Dr. Bryan noted in December that although Lesley complained of pain, a straight leg raising test was negative bilaterally and her gait was normal. (Tr. 23 (citing Tr. 452)); *see Powers*, 207 F.3d at 435-36 ("[T]he discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating [her] condition.").

The ALJ's summary of the medical evidence acknowledges that Lesley's symptoms apparently increased by the end of 2009. A February examination revealed that Lesley had numbness, tingling, and pain in her right leg, as well as a positive straight leg raising test on the right. (Tr. 23 (citing Tr. 411-12).) In June, Dr. Bacchus found that Lesley moved slowly with an antalgic gait, used a cane, and had some range of motion deficits, yet still retained the functional capacity to perform light duties that allowed for frequent position changes. (Tr. 24 (citing Tr. 532-33).) In December, Dr. McGee documented that Lesley had limited range of motion in her lumbar spine and weakness in her right foot and ankle and recommended that she undergo a lateral mass fusion, laminectomy, and decompression, which she did in April 2010. (Tr. 25 (citing Tr. 631-32, 698).)

But as the ALJ correctly observed, by May 2010, one month after her surgery, Lesley reported that she was "significantly improved." (Tr. 26 (citing Tr. 729).) Likewise, in June, she stated that her pain was under control and that her condition was "slightly improved." (Tr. 26 (citing Tr. 724).) In August, although she complained of pain at a level "seven," a physical examination indicated that she was non-tender to palpation of the lumbar paraspinal muscles and a straight leg raising test was negative bilaterally. (Tr. 26 (Tr. 720).) Based on this evidence, the

ALJ concluded that Lesley's symptoms improved to some extent after her surgery. (Tr. 26); *see* 20 C.F.R. §§ 404.1512(c), 416.912(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."); *see also Betancourt v. Apfel*, 23 F. Supp. 2d 875, 879, 882 (N.D. Ill. 1998) (explaining that the relevant inquiry is whether the claimant's pain was of a disabling severity during the relevant period, not the fact that he was diagnosed with an impairment).

The ALJ also considered that although Dr. McGee, Lesley's treating orthopaedist, told Lesley at her first post-operative visit not to lift more than ten pounds, to refrain from bending or twisting, and to use a cane, there was no indication that these were permanent restrictions. (Tr. 27 (citing Tr. 729).)  In any event, the ALJ assigned an RFC fairly consistent with these temporary restrictions assigned by Dr. McGee. (Tr. 27 (citing Tr. 729).)

Furthermore, the ALJ also considered Lesley's activities of daily living when assessing the credibility of her symptom testimony.  He noted that she drives a car and performs light meal preparation, dishes, laundry, and shopping, other than heavy lifting. (Tr. 19, 21-22, 28); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1997 WL 374186, at *3.  More significantly, the ALJ considered that Lesley worked two eight-hour days a week as a supervisor of a convenience store (a skilled, light work job) for two years after her alleged onset, that is, through December 28, 2009, the date she originally planned to have her back surgery. (Tr. 29, 67.)  Coworkers assisted her with physical tasks that required heavy lifting or more mobility, but her supervisor said she had no problems with concentration. (Tr. 67 (citing Tr. 230-31, 696-97).)  Although the diminished number of hours per week

indicates that Lesley was not at her best, the fact that she could perform this part-time work cuts against her claim that she suffered back pain or medication side effects in 2008 and 2009 at the level of severity that would preclude even sedentary work activity. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).

And the ALJ did indeed credit Lesley's symptom testimony to a significant extent, acknowledging that her back pain caused her to use a cane; reduced her lifting capacity; and limited her ability to perform prolonged standing, sitting, or walking. Accordingly, to accommodate these limitations, the ALJ assigned an RFC for sedentary work with a sit-to-stand option that allowed her to use a cane. (Tr. 496, 500); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming ALJ's credibility determination where he discredited the claimant's symptom testimony only in part).

To summarize, the ALJ adequately considered the credibility of Lesley's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and 416.929(c) and ultimately determined that her symptoms were not of disabling severity during the relevant period. In doing so, the ALJ sufficiently built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination concerning Lesley's symptom testimony, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### D. The ALJ's Consideration of Dr. Bryan's Opinion Is Supported by Substantial Evidence

Lesley also contends that the ALJ erred in assigning little weight to the medical source statement provided by Dr. Bryan, her treating family practitioner. Dr. Bryan opined that Lesley

could work only five hours per week, would need to walk for fifteen minutes more than ten times during an eight-hour period, would need to take twenty-five minute breaks every hour, and would miss more than three days of work a month. (Tr. 716-17.)  The ALJ's discounting of Dr. Bryan's extreme restrictions, however, is supported by substantial evidence.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. §§ 404.1527(c), 416.927(c).

Furthermore, a claimant "is not entitled to DIB [or SSI] simply because [her] treating physician states that [she] is 'unable to work' or 'disabled.'" *Clifford*, 227 F.3d at 870.  Rather, the determination of disability is reserved to the Commissioner. *Id*.; *Diaz v. Chater*, 55 F.3d 300,

306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); SSR 96-5p, 1996 WL

374183, at *2.  In fact, "treating source opinions on issues reserved to the Commissioner are

never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2;

*see Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20

C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  "Giving controlling weight to such opinions would, in

effect, confer upon the treating source the authority to make the determination or decision about

whether the individual is under a disability, and thus would be an abdication of the

Commissioner's statutory responsibility to determine whether an individual is disabled." SSR

96-5p, 1996 WL 374183, at *2; *see Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ thoroughly considered Dr. Bryan's medical records, including her June 25,

2010, medical source statement conveying the severe restrictions described above.  In fact, the

ALJ penned *not less than five paragraphs* discussing Dr. Bryan's various opinions and clinical

findings. (*See* Tr. 23, 27-28.)  Nonetheless, the ALJ ultimately discounted the extreme

restrictions described by Dr. Bryan in her medical source statement, choosing to assign greater

weight to the opinions of the consulting and reviewing physicians, who concluded that Lesley

retained the capacity to perform at least sedentary work (Tr. 28-29). *See generally Dixon*, 270

F.3d at 1177 (acknowledging that a consulting physician's opinion may offer "the advantages of

both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir. 2000)

(emphasizing that a consulting physician may bring expertise and knowledge of similar cases).

There is no real dispute that Dr. Bryan's medical source statement is significantly

inconsistent with the other medical source opinions of record who found that Lesley could

perform at least sedentary work; thus, Dr. Bryan's opinion is not entitled to controlling weight.

*See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004). Therefore, Lesley essentially contends that the ALJ erred when weighing the factors articulated in 20 C.F.R. §§ 404.1527(c) and 416.927(c), urging that such factors favor assigning Dr. Bryan's opinion the greatest weight.

But when considering Dr. Bryan's opinion, the ALJ explained that he discounted it for several reasons. *See generally Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) ("An ALJ must offer good reasons for discounting the opinion of a treating physician." (citations and internal quotation marks omitted)). First he considered that Dr. Bryan's specialty was internal medicine, not orthopaedics, and that she saw Lesley primarily for routine visits and medication management; it was Dr. McGee, rather, who treated Lesley's spinal stenosis and performed her back surgery. The ALJ also thought that Dr. Bryan's medical source statement was conclusory, lacking substantial support from her own records and other evidence of record, and not particularly consistent with her conservative course of treatment and treatment notes. (Tr. 27-28.) Lesley challenges each of the reasons provided by the ALJ for discounting Dr. Bryan's opinion. She first argues that the ALJ should not have discounted Dr. Bryan's opinion on the basis of her specialty because the consulting and reviewing physicians also were not orthopaedists. As Lesley sees it, Dr. Bryan was no less qualified than these consulting and reviewing specialists to opine about her limitations.

But "[s]tate agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are

also experts in social security disability evaluation."); *Ottman*, 306 F. Supp. 2d at 838 (same).

Indeed, "[i]n the end, it is up to the ALJ to decide which doctor to believe—the treating

physician who has experience and knowledge of the case, but may be biased, or . . . the

consulting physician, who may bring expertise and knowledge of similar cases—subject only to

the requirement that the ALJ's decision be supported by substantial evidence." *Books*, 91 F.3d

972, 979 (7th Cir. 1996) (citation and internal quotation marks omitted); *accord Micus v. Bowen*,

979 F.2d 602, 608 (7th Cir. 1992). Therefore, although the consulting and reviewing physicians

were not orthopaedists, they are specialists in disability evaluation.

Lesley also nitpicks the second reason that the ALJ provided, arguing that Dr. Bryan *did*

treat her for her back problems and chronic pain and administered at least two thorough physical

examinations. She concedes, however, that the orthopaedists "provided the bulk of the

treatment," but emphasizes that Dr. Bryan received written updates about the orthopaedic care

provided. But Lesley's argument is a nitpick of the ALJ's reasoning, as Dr. Bryan's treatment

records reveal that she only occasionally performed neurological or musculoskeletal

examinations. (Tr. 28, 450-56, 662, 665-70, 674, 731); *see Rice v. Barnhart*, 384 F.3d 363, 369

(7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the

opinion a commonsensical reading rather than nitpicking at it"). That Dr. Bryan received written

updates from the orthopaedic specialists does not change the fact that the orthopaedists, not Dr.

Bryan, performed most of the treatment for her back problems.

In addition, Lesley criticizes the ALJ's view that Dr. Bryan's clinical findings and course

of treatment were not necessarily consistent with the extreme restrictions that she assigned in her

medical source statement, asserting that the ALJ "does not explain why it was inconsistent."

(Opening Br. 17.) But as summarized earlier, Dr. Bryan's treatment notes center on medication management and Lesley's other health conditions, such as hypertension and diabetes. The fill-in-the-blank medical source statement was the first that Dr. Bryan assigned such extreme restrictions, which undercuts their veracity. *See, e.g.*, *Morris v. Astrue*, No. 1:09-cv-99, 2010 WL 403360, at *8 (N.D. Ind. Jan. 27, 2010) (discounting severe restrictions penned by a treating physician in his medical source statement where they were not reflected in his treatment notes) (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527).

Moreover, as the ALJ observed, Dr. Bryan's restrictions stand in stark contrast to all of the other medical opinions of record, including Dr. McGee, who instructed her after surgery (presumably, on a temporary basis) to limit lifting to ten pounds, refrain from twisting and bending, and to use a cane, and the consulting and reviewing physicians, who opined that she could perform at least sedentary work. Of course, an ALJ is entitled to discount a medical source opinion when it is inconsistent with the other evidence of record. 20 C.F.R. § 404.1527(c), 416.927(c) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (discounting treating physician's opinion that claimant was unable to perform even sedentary work where it was inconsistent with other medical evidence of record); *Books*, 91 F.3d at 979 (stating that an ALJ must consider a variety of factors, including the consistency of the evidence, when assessing conflicting medical opinion evidence).

In any event, as explained *supra*, the determination of a claimant's RFC is an issue reserved to the Commissioner, 20 C.F.R. §§ 404.1527(d), 416.927(d), and "treating source

opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance," SSR 96-5p, 1996 WL 374183, at *2; *see generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, despite Lesley's plea to the contrary, the ALJ is under no obligation to afford Dr. Bryan's extreme restrictions a significant amount of weight.

And, insofar as the consulting and state agency physicians' opinions conflict with Dr. Bryan's June 2010 opinion, the ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's complaint that the ALJ gave greater weight to an earlier mental examination than to one conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do"). The Court cannot accept Lesley's invitation to substitute its judgment for the Commissioner concerning the weight to apply to Dr. Bryan's June 2010 medical source statement. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence"); *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993) ("We must affirm the ALJ's decision if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support [the claimant's] claim.").

In sum, the ALJ's rationale for discounting Dr. Bryan's opinion is adequately supported and easily traced. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate

his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)).  Accordingly, Lesley's challenge to the ALJ's consideration of Dr. Bryan's opinion does not merit a remand of the Commissioner's final decision.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Lesley.

SO ORDERED.

Enter for this 29th day of April, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge